UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA

In re                                                        Case No. 12-80537-WRS
                                                             Chapter 13
DERRICK T. RUSSELL,

    Debtor

## MEMORANDUM DECISION

This Chapter 13 case came before the Court on September 26, 2012, in Opelika, Alabama, on the Court's Order to Appear and Show Cause. (Doc. 25). For the reasons set forth below, this case is DISMISSED WITH PREJUDICE.

## I. FACTS

### A. History of this Case

The Debtor filed a petition in bankruptcy pursuant to Chapter 13 of the Code on April 12, 2012. (Doc. 1). Confirmation of the Debtors Plan was first scheduled for July 11, 2012. (Doc. 7). The Chapter 13 Trustee filed an objection to confirmation contending that the Debtor's Plan did not satisfy the "disposable income test." (Doc. 16).[1] The Debtor responded by amending his Statement of Current Monthly Income. (Doc. 18). In addition, the Debtor objected to the secured claim filed by Myra Gamble, contending that her claim was not secured because there was no property to which her judgment lien could attach. (Doc. 20). Ms. Gamble, acting pro se, appeared in person complaining of her treatment under the Plan, which she thought unjust. The Court took Ms. Gamble's objection under advisement.

---

[1] A Chapter 13 Plan must either pay 100% of unsecured claims or propose to pay all of the Debtor's projected disposable income, over a period of three to five years. 11 U.S.C. § 1325(b).

While considering Ms. Gamble's objection, the Court searched its records looking for prior bankruptcy filings and learned that the Debtor and his wife had filed a total of 10 bankruptcy case since 1989. Upon discovering this extraordinary history of bankruptcy filings, the Court entered a Show Cause Order on August 23, 2012, giving the Debtor notice that the Court intended to confront him with this history and consider dismissal of his case, possibly with prejudice. (Doc. 25). On September 26, 2012, the Court heard additional argument from the parties and heard argument on all issues, including the question, raised <u>sua sponte</u>, as to whether the case should be dismissed in light of the large number of prior bankruptcy filings. After hearing argument on September 26, 2012, the Court again took this case under advisement.

### B. The Debtor's Prior Bankruptcy Filings

Upon reviewing its records, the Court learned that the Debtor, and his wife Kathy Russell have filed a total of 10 bankruptcy cases in the past 23 years. The following is a summary of pertinent information from those cases.

1. On November 23, 1989, Kathy Russell, the Debtor's wife, filed a petition in bankruptcy pursuant to Chapter 13, which was dismissed without a discharge on January 26, 1994. (Case No. 89-4267)(Case 1).

2. On October 26, 1990, the Debtor filed a petition pursuant to Chapter 13, which was dismissed on September 9, 1993. (Case No. 90-4038)(Case 2).

3. On January 26, 1995, Kathy Russell filed a petition in bankruptcy pursuant to Chapter 13, which was dismissed without a discharge on August 30, 1995. (Case No. 95-2749)(Case 3).

4. On September 27, 1996, the Debtor and his wife filed a joint petition pursuant to Chapter 13, which was dismissed without a discharge on February 5, 1998. (Case No. 95-2886)(Case 4).

5. On November 14, 1997, the Debtor and his wife filed a joint petition in bankruptcy pursuant to Chapter 13, which was dismissed without a discharge on February 5, 1998. (Case No. 97-5770)(Case 5).

6. On April 1, 2002, the Debtor filed a petition in bankruptcy pursuant to Chapter 13, which was dismissed without a discharge on March 5, 2004. (Case No. 02-80451)(Case 6).

7. On July 21, 2004, the Debtor filed a petition in bankruptcy pursuant to Chapter 13, which was dismissed without a discharge, and with a 180-day injunction against refiling on October 22, 2004. (Case No. 04-81033)(Case 7).

8. On April 27, 2007, Kathy Russell filed a petition in bankruptcy pursuant to Chapter 13. The case was converted to a case on October 8, 2010, and a discharge was entered on April 6, 2011. (Case No. 07-80308)(Case 8).

9. On April 28, 2009, the Debtor filed a petition in bankruptcy pursuant to Chapter 13 and was discharged on November 15, 2010. (Case No. 09-80668)(Case 9).

10. On April 12, 2012, the Debtor filed a petition in bankruptcy pursuant to Chapter 13, which initiated this case. (Case 10).

In addition to the sheer number of filings, these cases are noteworthy for two other reasons. First, of the 9 prior cases, 7 were dismissed without discharge. In other words, they were dismissed either because Chapter 13 Plan payments were not made or for some other violation of the rules. Second, the one case in which the Debtor did receive a discharge, his

creditors received practically nothing. See (Case No. 09-80668)(Doc. 47). In Case No. 09-80668, the Debtor paid a total of $6,190.00 to the Chapter 13 Trustee. Of that amount, $2,500.00 was paid to his lawyer. In addition, $224.00 was paid for court costs and $226.20 to the Chapter 13 Trustee. Only $674.88 was paid to unsecured creditors and $355.30 was paid to secured creditors. Surprisingly, $2,145.94 was returned to the Debtor. The reason for the extraordinarily low amount paid to unsecured creditors is that only three unsecured creditors filed claims and the Debtor objected to two of them. Both of these objections were sustained by default. (Case No. 09-80668)(Doc. 37). The Court has observed a phenomenon in instances, such as this, where a debtor has filed a large number of cases over a period of years. Eventually, the creditors give up and quit filing claims as they will most likely be paid little or nothing and they may be called upon to defend a frivolous objection to their claim–which will probably not be paid in any event.

### C. The Plan in the Current Case

On December 8, 2011, Myra Gamble brought a civil action against the Debtor in Tallapoosa County, Alabama, alleging breach of contract. According to the allegations in her complaint, Gamble entered into a contract with the Debtor to make an addition to her house. The contract price was $13,469.00, of which $7,000.00 was paid. The Debtor removed a portion of the roof on the Debtor's house, did a minimal amount of work and then abandoned the project, leaving Gamble's residence exposed to the elements. Gamble later paid another contractor $16,000.00 to repair the damaged caused by the Debtor and complete the work. The Debtor did not respond to the complaint, and the District Court in Tallapoosa County entered judgment by

4

default in favor of Gamble, and against the Debtor, in the amount of $9,531.00, on March 5, 2012.

Gamble next brought garnishment proceedings against the Debtor in an effort to collect her judgment. In response, the Debtor filed a petition in bankruptcy in this Court initiating this Chapter 13 case. The Debtor filed a Chapter 13 Plan, proposing a 0% distribution to unsecured creditors. (Doc. 4). The Debtor reports, in Schedule I, that he works for the Alexander City Schools making $1,207.89 per month and that he earns another $100 per month from "his construction." In response to Question Number 1 in the Statement of Financial Affairs, where he is required to disclose his gross income for the current year and the two years immediately preceding, it appears that he has disclosed only his income from the Alexander City Schools and understated his income from his construction work. If the Debtor did in fact receive the $7,000 alleged by Gamble in her suit, it does not appear to have been reported in the Statement of Financial Affairs. In response to Question 4 of the Statement of Financial Affairs, the Debtor reports two lawsuits; the one brought by Gamble and another brought by an individual named Dana Ford. Gamble is listed in Schedule F as being owed $9,813.00, but Dana Ford is reported to be owed only $5.00. The Debtor's claim that Ford is owed only $5.00 is not credible. Rather, it appears that he has made a business of taking installments on construction contracts and not completing the work, thereby defrauding victims such as Gamble and Ford. In summary, the Debtor has filed a Chapter 13 Plan which would pay nothing to unsecured creditors such as Gamble. It appears that the Debtor has understated his income and understated his unsecured debt.

5

Case 12-80537    Doc 34    Filed 11/27/12    Entered 11/27/12 15:10:58    Desc Main
Document      Page 5 of 17

## II. LAW

### A. General Considerations

The main question here is whether the Debtor filed his petition, and plan in good faith. The secondary question is, having found bad faith, what should be the remedy. This Court has jurisdiction pursuant to 28 U.S.C. § 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (L). This is a final order.

### B. Bad Faith is Found Here Because:

1. **The Debtor Has a History of Filing a Large Number of Cases;**
2. **The Prior Cases Were Also Filed in Bad Faith;**
3. **The Debt Owed to Myra Gamble was Incurred in Bad Faith;**
4. **The Current Plan Proposes to Pay Nothing to Unsecureds**;
5. **The Totality of the Circumstances Indicates Bad Faith**

A fundamental principle underlying Chapter 13 bankruptcy proceedings is that the debtor should, in all respects, act in good faith with respect to his creditors, the Trustee and the Court. See 11 U.S.C. §§ 1325(a)(3); 1307(a)(1), (3); In re Kitchens, 702 F.2d 885 (11th Cir. 1983). While there is no formulaic test one may apply to a given case to determine whether good faith is present, there is broad agreement that "the basic inquiry should be whether or not under the circumstances of the case there has been an abuse of the provisions, purpose or spirit" of the Bankruptcy Code. In re Kitchens, 702 F.2d 885, 888. In other words, it is a totality of the

6

circumstances test. Additional guidance was provided in Kitchens in the form of eleven nonexclusive factors that the Court may consider:

> (1) the amount of the debtor's income from all sources; (2) the living expenses of the debtor and his dependents; (3) the amount of attorney fees; (4) the probable or expected duration of the debtor's Chapter 13 plan; (5) the motivations of the debtor and his sincerity in seeking relief under the provisions of Chapter 13; (6) the debtor's degree of effort; (7) the debtor's ability to earn and likelihood of fluctuation in his earnings; (8) special circumstances such as inordinate medical expense; (9) the frequency with which debtor has sought relief under [Title 11]; (10) the circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealing with his creditors; and (11) the burden which the plan's administration would place on the trustee.

Id. at 888-889. Kitchens further listed additional factors, such as "substantiality of the repayment to the unsecured creditors", the dischargeability of the debts under Chapter 7, and the accuracy of the plan's schedules and statements. Id. Three of the Kitchens factors seem particularly of interest here. First, the sheer number of prior filings; second, the debtor's degree of effort; and third, the circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealings with his creditors. Id.

    1. Prior Bankruptcy Filings

As set out in detail in Part I(B) above, this case is extraordinary in the sheer number of prior bankruptcy filings. The Debtor and his wife have, either jointly or separately, filed 10 bankruptcy petitions in the past 23 years. The filing of a petition in bankruptcy should be an extraordinary event in one's life. The goal should be that the debtor rehabilitates himself and becomes a productive member of society, free of debts that he cannot pay. In the case of this Debtor, bankruptcy has become a way of life. That is, he appears to order his affairs so as to

7

avoid paying his debts. Indeed, he appears to act in a reckless manner, knowing that he can always file bankruptcy and avoid the consequence of his actions.

In this case, the sheer number of previous bankruptcy filings, standing alone, calls into question the Debtor's good faith. In a recent decision, the Bankruptcy Court for the Northern District of Alabama dismissed a case with prejudice, and ordered counsel to return client fees, where the filing was the debtor's tenth filing. In re Smith, 2012 WL 3238835 (Bankr. N.D. Ala. May 24, 2012) (finding that ten prior filings and omissions in the schedules indicative of bad faith). The court found that the debtor's motivation to file under chapter 13 was "not because of any sincerity in adjusting his debts," and was rather evidence of bad faith. Id. at *5. The method in which the debtor in Smith, like the Debtor in the present case, ordered his affairs to avoid paying his debts created a pattern which the court found to "smack[] of bad faith." Id. Certainly, serial filings have played a central role in courts reaching the conclusion that a case has been filed in bad faith. See In re Vanfossen, 258 B.R. 814 (Bankr. N.D. Ala. 2001) (finding that eight filings in six years was enough to dismiss due to bad faith, award attorneys' fees, and issue an injunction on re-filing); see also In re Green, 214 B.R. 503, 508 (Bankr. N.D. Ala. 1997) (finding that seven prior filings showed "an obvious attempt to forestall collection" of debts and thus were done in bad faith). Filing one Chapter 13 plan after another "merely for the purpose of stalling" without any "legitimate or realistic hope" on the part of the debtor of paying off a debt or saving some property is a maneuver a bankruptcy court cannot condone. In re Moulton, 393 B.R. 752, 763 (Bankr. N.D. Ala. 2008).

8

## 2. Prior Filings in Bad Faith

In addition to the absolute number of filings, it is also significant that 7 of the previous 9 filings were unsuccessful. On the one hand, nothing in life is certain, and many Chapter 13 cases fail notwithstanding a debtor's best efforts, one would suppose that a debtor would eventually get it right, or give up and quit filing Chapter 13 cases. Indeed, of the two "nonfailure" cases above, one was a case of his wife which began as a Chapter 13 and then converted to a case under Chapter 7, and the other was the only one which paid out.

While it is significant that only one of the previous nine cases involved a Chapter 13 case which "paid out" and resulted in a "full compliance" discharge pursuant to 11 U.S.C. § 1328(a), the granting of a full compliance discharge is not irrefutable proof of a debtor's good faith, even in that case. See (Case No. 09-80668). In that case, only three unsecured claims were filed and the Debtor objected to two of them–on the grounds of the statute of limitations. Given that the statute of limitations was tolled during the pendency of the prior Chapter 13 cases, it is questionable that the Debtor's statute of limitations argument was valid. See 11 U.S.C. § 108(c). However, as the two creditors in question did not respond, the issue was not placed before the Court. As the Debtor in Case No. 09-80668 paid only $674 to unsecured creditors, while paying $2,500 to his lawyer, one questions the need for a bankruptcy filing in the first place.

Yet another indication of the Debtor's bad faith may be found in Case No. 04-81033, which was the Debtor's seventh case. The petition in that case was filed on July 21, 2004. The Debtor did not appear for the meeting of creditors and did not make even one Plan payment. (Case No. 04-81033)(Doc. 13). By this time, the Debtor was an old bankruptcy hand, well aware

9

of the rules. His failure to appear and failure to make payments could not have been the result of an honest mistake or confusion. For the price of a filing fee, he received the benefit of the automatic stay for 90 days, perhaps holding off the repo man while he continued to drive his Cadillac.[2] The Plan filed in Case No. 04-81033 proposed to pay unsecured creditors 100 cents on the dollar, yet the Debtor failed to make the first payment. In contrast, the Plan in the instant Chapter 13 case proposes to pay 0%. Perhaps this begs the question, is it better to file a Plan promising to pay everything, while intending to pay nothing, or promising to pay nothing, intending to keep that promise.

### 3. The Debt Owed to Myra Gamble was Incurred in Bad Faith

One additional factor considered by the <u>Kitchens</u> court, taken from the Eighth Circuit, is the "accuracy of the plan's statements of debts and expenses and whether any inaccuracies are an attempt to mislead the court." <u>Kitchens</u>, 702 F.2d at 889 (citing <u>In re Estes</u>, 695 F.2d 311, 317 (8th Cir. 1982)). Examination of this factor is warranted when the debtor displays an "underestimation of income an overestimation of expenses." <u>Id.</u> A debtor's filing of inaccurate schedules can be a basis for a finding of bad faith. <u>In re Jackson</u>, 2012 WL 909782 (Bankr. N.D. Ala. Mar. 16, 2012) (the omission of some creditors from the debtor's schedules was one factor leading to a finding of bad faith). Bad faith was found in the case of <u>In re Hatem</u>, when the debtor's schedules failed disclose a creditor's one-half ownership interest in a piece of property,

---

[2] The Debtor reported in his Schedules that he owned a Cadillac Catera. He estimated its value at $7,675, while reporting that he owed Capital One Auto Finance $15,819. In the Plan filed with the Court, he proposed to keep the Cadillac and pay its value over the life of the Plan. The Court's record does not indicate when Capitol One ever got its vehicle back.

10

and further incorrectly reported the amount of a secured lien on the property. In re Hatem, 273 B.R. 900 (S.D. Ala. 2001). In Hatem, the debtor "made it appear that property worth only $205,000.00 was subject to secured debt 0f $264,623.00," when in fact the property's value was double and the secured debt was only roughly $55,000.00. Id. at 905.

However, the inaccuracies and misrepresentations found in a debtor's schedules need not be as egregious as those in Hatem. In Smith, the Bankruptcy Court for the Northern District of Alabama considered a debtor's inaccurate schedules as one of several factors leading to a finding of bad faith and a dismissal of a chapter 13 plan. Smith, 2012 WL 3238835 at *5. There, the debtor failed to disclose the dates on which he incurred the debts, and further did not fully disclose all of his monthly income. Id. at *1. Because of the debtor's inaccuracies and underreporting of his schedules, the court was never able to grasp whether there was enough income to support a viable plan. The same is true with the Debtor before this Court.

First, the Debtor has failed to accurately represent his income. The Debtor drives a school bus part time earning $1,200 per month and claims that he makes $100 per month doing construction.[3] In answer to Question No. 1 of the Statement of Financial Affairs, the Debtor was called up to state his gross income for the year to date and the prior two years. (Doc. 1). Instead, the debtor lumped his bus driving wages in with what he claims is his construction net income–a

---

[3] Debtors are now required to submit copies of payment advices for payments received within 60 days of filing. 11 U.S.C. § 521(a)(1)(iv). In this case, the Debtor failed to file copies of any paystubs, instead filing an affidavit stating that he had lost "some" of his paystubs. (Doc. 5).

11

clear evasion of the question and further evidence of bad faith. It is not possible to get any idea as to the size of the Debtor's construction business given his lack of disclosure.

Second, the Debtor does not provide the date certain debts were incurred. The Debtor lists two debts of interest in his Schedule F. He reports an indebtedness to Myra Gamble in the amount of $9,813.00 on an "open account." He does not provide the date incurred and he does not list the debt as disputed. In fact, Gamble had obtained a judgment. Yet, in answer to Question No. 4 of the Statement of Financial Affairs, the Debtor lists Gamble's suit as "pending" rather than ending in a final judgment. The Debtor also lists a suit filed by Dana Ford, but he is scheduled as being owed only $5.00. Apparently, another specious claim. As the court in Smith noted, the Court does not always engage in such close scrutiny of schedules, but a petition from a serial filer warrants "careful[] review[] for accuracy and completeness." Id. at *1 n. 3.

Gamble testified at a hearing that she had entered into a contract with the Debtor to add a room onto her house. She paid him $7,000.00 on the total contract price of $16,000.00. Gamble testified that he not only did not complete the work, but he abandoned the project, leaving her home exposed to the elements. Gamble brought suit against the Debtor and was awarded judgment by default in the amount of $9,783.00. On March 26, 2012, Gamble sued out a writ of garnishment from the District Court in Tallapoosa County to the Alexander City Schools. On April 4, 2012, a representative of the Alexander City Schools filed a return of the writ, stating that the Debtor was employed by them and that they would honor the garnishment. (Claim No. 3). Eight days later, the Debtor filed his petition in bankruptcy initiating this case.

Question 4(b) of the Statement of Financial Affairs calls for the Debtor to disclose all property garnished or seized within the past year. Notwithstanding the fact that Gamble has just

12

days before started garnishment proceedings and notwithstanding the fact that it was this garnishment proceeding which undoubtedly caused the Debtor to file this bankruptcy proceeding, he nevertheless answered Question 4(b) "none." While it is difficult to see how this misrepresentation benefitted the Debtor, it is yet another indication of his disregard for the Court, its process and his obligations under the Bankruptcy Code. This is not an isolated misrepresentation, but one piece of a larger pattern of misrepresentations.

The Court is also to consider "the circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealing with his creditors." Kitchens, 702 F.2d at 888-889. Turning to the specifics of the debt owed to Gamble, it appears that the Debtor conducts his business is such a way so as to avoid responsibility for shoddy workmanship and outright indifference. The Court heard testimony from both Gamble and the Debtor and found Gamble to be forthright and credible and the Debtor to be evasive and not credible. The Debtor did not have a reasonable explanation as to how the Gamble project went so wrong or why he did not complete the work. At a minimum, it appears that the Debtor was careless and lackadaisical in his approach to his work on Gamble's home. At worst, it was outright fraud. In any event, the Debtor's bona fides in his dealings with Gamble are indicative of bad faith. The Debtor's lack of bona fides here is a significant negative factor.

### 4. The Proposed Plan Pays Nothing to Unsecured Creditors

In Kitchens, the Eleventh Circuit stated that a Bankruptcy Court should consider the Debtor's degree of effort, and the substantiality of repayment to unsecured creditors. Kitchens, 702 F.2d at 888-89. A Plan such as that proposed by the Debtor here will pay nothing to the

13

holders of unsecured claims. As it is questionable whether the Debtor has reported all of his income, a zero percent plan, coupled with doubts as to the veracity of the Debtor's filings raises serious questions as to good faith.

In a recent case handed down by a Bankruptcy Court in the Northern District of Alabama, the Court found a lack of good faith where only a small amount payment would be made to unsecured creditors, with the bulk of the funds going to the Debtor's lawyer. Jackson, 2012 WL 909782. The Court in Jackson noted that often when a plan seeks to only make nominal payments, or no payments at all, to unsecured creditors, it is only seen as being proposed in good faith when some exceptional circumstances are present. Id. at *8 (citing Matter of Bellgraph, 4 B.R. 421 (Bankr. W.D. NY 1980) (exceptional circumstances found when totally disabled mother of seven proposed plan to only pay off taxes and secured creditors in an effort to save the family home)). The same Bankruptcy Court found a proposed distribution of only 10% to unsecured creditors to not be substantial enough, and a factor leading to the conclusion of bad faith. In re Hicks, 2011 WL 2414419 (Bankr. N.D. Ala. June 15, 2011).

In a similar case out of this Court, confirmation of a Chapter 13 Plan, which proposed to pay only $1,000 to the holders of unsecured claim was denied, noting that the sole purpose of the Plan was to pay the Debtor's lawyer. In re Nelson, 2009 WL 2241567 (Bankr. M.D. Ala. July 24, 2009). The instant proceeding is different from both Nelson and Jackson in that two secured creditors will be paid, however, in this case nothing will be paid to the holders of unsecured claims. The payment of a zero dividend to unsecured creditors is a factor indicative of bad faith.

14

### 5. Totality of the Circumstances

The determination of whether a Chapter 13 Plan is filed in good faith is, at bottom, one which looks to the totality of the circumstances. The facts of an individual case "carry more weight than the simple raw number of cases filed." <u>Vanfossen</u>, 258 B.R. at 821 n. 11; see also, <u>In re Bates</u>, 243 B.R. 466 (Bankr. N.D. Ala. 1999) (finding good faith despite five prior filings when looking at the entire circumstances of the case and past filings). This case may arguably be one where no one fact, standing alone, is indicative of bad faith. Yet, when one looks at the totality of the circumstances, bad faith is unmistakably found. For example, one or two prior bankruptcy filings, by itself, may not disqualify one from relief under Chapter 13. <u>See</u> <u>Moulton</u>, 393 B.R. at 763 (a debtor's third filing, standing alone, was not enough to represent a serial filing or bad faith). But 10 prior filings, including 7 unsuccessful Chapter 13 cases, is a strong, if not conclusive, indicator of bad faith. The circumstances under which the debt to Gamble was incurred, along with a zero percent plan are also strong indicators of bad fath, particularly when weighed with others. Considering all facts here leads unmistakably to the conclusion that the Plan here is not filed in good faith. For this reason, the Court finds that the Debtor has not filed this case in good faith.

### **C. Having Found Bad Faith, What is the Remedy?**

As the Court has found that the Debtor proposed his Plan in bad faith, the next question is what should be done. At one end of the spectrum, the Court could simply deny confirmation and permit the Debtor to file another Plan, and attempt to cure the problem of bad faith. This is the

15

least drastic remedy and should be the first resort. If it is possible to cure the bad faith yet grant the Debtor relief, that should be the preferred resolution. In this case, it is not possible to change the Debtor's history of bankruptcy filings nor the history of his dealings with Gamble. To be sure, he could file an amended plan proposing to pay more to his unsecured creditors, but two problems arise. First, given the problem with the Debtor's disclosures, it is not possible to determine with any reasonable degree of certainty whether such a Plan is his best effort. Second, if he were to file a 100% plan, it would probably not be feasible. See, 11 U.S.C. § 1325(a)(6). If he could show feasibility, it would further call into question the accuracy of his original filings and raise further questions of bad faith. Considering the facts here, denial of the Plan, without dismissal of the case, would not be appropriate.

Having determined that this case should be dismissed, the Court must next consider whether it should be "with prejudice" as that term is used in 11 U.S.C. § 349(a). In a case dismissed with prejudice, debts in existence at the time of the filing, such as Gamble's, will not discharge in a future case. See, In re Brown, 319 B.R. 691 (Bankr. M.D. Ala. 2005) (recognizing that such dismissals are appropriate only when the abuse of the Bankruptcy Code is egregious); In re Jones, 289 B.R. 436 (Bankr. M.D. Ala. 2003) (to same effect). Again, considering the totality of the circumstances, the Court finds that this case is appropriate for dismissal with prejudice. This case is almost a perfect storm of bad faith: a large number of prior filings; a zero percent plan; bad faith in dealing with creditors prior to bankruptcy filing; and questionable accuracy of filings all combine to result in a finding of that dismissal with prejudice is appropriate.

16

# III. CONCLUSION

Considering all the facts, the Court concludes that this case should be dismissed, pursuant to 11 U.S.C. § 349(a), with prejudice, in that in any future bankruptcy filing, the debts now in existence will not discharge. A number of facts in combination compel this result. First, there is the Debtor's extraordinary history of bankruptcy filings. Ten cases over 22 years is remarkable. Second, it appears that the Debtor is a one-man home wrecking crew. He did not deal in good faith with Gamble. Third, there were a number of errors or omissions in the Schedules and Statements, another indicator of bad faith. Fourth, the current plan proposes to pay nothing to the holders of unsecured claims. Considering all the facts and circumstances here, dismissal with prejudice is the only appropriate result. The Court will enter a separate order of dismissal.

Done this 27th day of November, 2012.

/s/ William R. Sawyer
United States Bankruptcy Judge

c: David S. Clark, Attorney for Debtor
Curtis C. Reding, Trustee
Myra T. Gamble, *2245 Daywell Street, Alexander City, AL 35010*